IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 10, 2012

**STATE OF TENNESSEE v. DOUGLAS EMORY CARLTON**

**Appeal from the Circuit Court of Weakley County**
**No. CR-108-2009     William B. Acree, Jr., Judge**

**No. W2011-01444-CCA-R3-CD  - Filed August 1, 2012**

Douglas Emory Carlton ("the Defendant") appeals his jury conviction for burglary.  On appeal, he asserts that the trial court erred in denying his motion to suppress his statement made to police officers.  He also alleges that the evidence presented at trial was insufficient to support his conviction.  After a thorough review of the record and the applicable law, we affirm the Defendant's conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Beau E. Pemberton, Dresden, Tennessee, for the appellant, Douglas Emory Carlton.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Thomas A. Thomas, District Attorney General; and Kevin McAlpin, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Factual and Procedural Background

A Weakley County Grand Jury indicted the Defendant and Amy Lynn McElroy on one count of burglary, a Class D felony.  The indictment arose from a charge that the Defendant and McElroy broke into a Dollar General Store in Greenfield and attempted to remove the store's safe.  Prior to the Defendant's trial, he moved to suppress his confession to law enforcement officials, and the trial court held an evidentiary hearing.

Agent Jeff Jackson, an investigator with the Tennessee Bureau of Investigation ("TBI"), testified that he received the Defendant's confession at approximately 5:00 p.m. on May 6, 2009, the day that the Defendant was arrested. The Defendant had been processed through booking and then placed in an interview room where he was met by Agent Jackson and another officer, Lieutenant Joey Radford. The Defendant was not handcuffed at the time of questioning. Agent Jackson was the agent primarily questioning the Defendant, and he began by explaining to the Defendant his <u>Miranda</u> rights. The Defendant signed a waiver of his <u>Miranda</u> rights.

In this interview, the Defendant mentioned that Amy McElroy, from whom the officers had learned of the Defendant's involvement in the burglary, was the Defendant's ex-wife. According to Agent Jackson, the Defendant admitted to his participation in a break-in at the Dollar General Store. Agent Jackson drafted a written confession, read the statement to the Defendant, and allowed the Defendant to make corrections. The Defendant signed the document, adopting it as his confession. Just before Agent Jackson left the room, the Defendant asked Agent Jackson what might happen to him. Agent Jackson told the Defendant that he would inform the district attorney's office of the Defendant's total cooperation but that he could make no guarantee of a reward for such cooperation. When asked about the Defendant's demeanor, Agent Jackson stated that he sat directly across the table from the Defendant and that he did not observe anything to make him think that the Defendant was intoxicated.

Officer Todd Barber, Dresden Police Department, testified that he, along with a few other officers, took part in arresting the Defendant based on allegations they had learned through an interview with Amy McElroy.[1] Other than McElroy, no one else had identified the Defendant in connection with this crime, and the agencies obtained no fingerprints or blood linking the Defendant to the scene of the burglary. Officer Barber placed the Defendant under arrest and transported the Defendant to the sheriff's office. According to Officer Barber, he said nothing to the Defendant besides something to the effect of "come on, let's go" from the time he placed the Defendant under arrest until the time they arrived at the sheriff's office. He acknowledged, however, that the Defendant, while in transit, spontaneously made a statement about McElroy "bringing him in on this."

After processing the Defendant at the sheriff's office, Officer Barber escorted the Defendant to the interview room, introduced him to Agent Jackson and Lieutenant Radford,

---

[1] The Defendant was taken into custody on arrest warrants for two offenses unrelated to each other. One of the arrest warrants pertained to the burglary at the Dollar General Store.

and then left the Defendant there with the two officers for questioning. He observed Agent Jackson read the Defendant his <u>Miranda</u> rights before Officer Barber returned to his office. Officer Barber stated that the Defendant seemed nervous but that he spoke coherently. He did not recall that the Defendant's eyes were "extremely dilated" and stated that the Defendant seemed "just surprised."

At the conclusion of the hearing, the trial court found that the Defendant had been sober and was not promised anything during the course of his confession. The court also found that the Defendant's statement had been intelligently given and was not the product of duress or coercion. Accordingly, the trial court denied the Defendant's motion to suppress his confession.

*Proof at Trial*

Dana Johnson testified that on Saturday night, April 18, 2009, she was the manager on duty at the Dollar General Store in Greenfield. After closing the store at approximately 9:15 p.m., she counted and placed money from the cash register securely in the office safe. She locked the office door, activated the security alarm, and locked the front door. Johnson stated that the alarm was a motion sensor pointed toward the office door. She did not notice there being a hole in the office wall or anything else unusual when she completed these tasks that evening. The only three people with access to the safe were: Johnson, an assistant manager; Michael Stone, an assistant manager; and Tammy Coffman, the manager. On the date of the burglary, the store was not equipped with surveillance cameras.

Michael Stone testified that on the morning of April 19, 2009, he was in charge of opening the store. He arrived at approximately 7:45 a.m. and, after deactivating the alarm, proceeded to the office. Upon opening the door, he found the office to be "ransacked." After observing papers and file bins strewn across the floor, Stone noticed a hole in the wall approximately three and a half feet from the safe. He shouted to another employee, and both of them fled the building and called the police. Stone described the safe as one that is bolted to the ground from inside so that the safe must be open in order to unbolt it. He also described the building's outside wall as having insulation covered by metal panels that could be removed easily. Stone estimated that the distance between the hole in the exterior wall to the hole in the office wall was between eight and ten feet. Even though the store's motion sensor focused on the door to the office, it did not surprise Stone that the culprit did not trigger the alarm because most of the office damage was low to the floor.

Officer Brian Cooper, Greenfield Police Department ("GPD"), testified that he responded to a call at the Dollar General Store on the morning of April 19, 2009. After securing the scene, he requested that Lieutenant Radford join him to investigate the break-in.

On the outside wall, Officer Cooper noticed that screws had been removed from a metal sheet seemingly in order to pry back the metal to enter the building. Inside the office, papers and shelves were displaced, and Officer Cooper surmised that the cause was from the entry into the office through the drywall. He noticed smudges from the sheet rock dust on the safe, as though someone had attempted to handle or grab the safe.

Lieutenant Joey Radford, GPD, testified that he arrived at the Dollar General Store on April 19, 2009, after receiving a call from Officer Cooper to respond to the scene. He spoke with Stone and assessed the damage in the store. He observed holes in the bathroom wall as well as the office wall. Lieutenant Radford examined the safe in the office and noticed a "smudge trail" on the safe from the drywall where someone "apparently tried to grab the side of the safe." However, he was unable to use the print for identification purposes. He did not take an inventory of the store because Stone told him that nothing was missing from the office.

On May 6th, 2009, Lieutenant Radford arrived at a residence where he found the Defendant behind the house installing a motor in a vehicle. From Lieutenant Radford's observations, the Defendant appeared coherent, did not smell of alcohol, and had no alcohol near the vehicle where he was working. Later that day, Lieutenant Radford interviewed the Defendant with another agent at the sheriff's department. He observed the Defendant as the Defendant received and waived his Miranda rights, and in Lieutenant Radford's opinion, the Defendant appeared to understand the rights explained to him. The Defendant then verbally confessed to breaking into the Dollar General Store.

Amy McElroy, the Defendant's ex-wife, testified that at the time of trial she was incarcerated in the Weakley County Jail for aggravated robbery. Although she and the Defendant were not married at the time of the Dollar General burglary, they were still friends who smoked "dope" together. On the night of the burglary, they had been "smoking dope" together and were driving past the Dollar General Store. McElroy dropped off the Defendant, and she parked the car. The Defendant unscrewed the sheet metal off the side of the building, and they entered through the sheet rock. McElroy stated that they intended to remove the safe from the building. After an unsuccessful attempt to remove the safe, McElroy and the Defendant returned to their vehicle, and the Defendant called a friend to ask for a cutting torch. However, according to McElroy, the friend, Wesley Hatchel, was unable to find a cutting torch, so the Defendant and McElroy left the scene.

McElroy admitted that when she initially spoke with police officers regarding this burglary she told them that she had been asleep during the incident. However, she later told the prosecutor the version of events to which she testified at trial. She stated that she was scared at the time of her initial statement because she had already confessed to a separate

-4-

armed robbery. At the time the prosecutor met with her, though, he notified her that her burglary charge related to this incident had been dropped. Additionally, the prosecutor informed her that, should she testify in the Defendant's trial, the State would write a letter to the parole board notifying it of her cooperation. She acknowledged that she wrote letters to the Defendant prior to trial stating that she had no other choice but to tell the truth at trial.

Agent Jeff Jackson testified that he also investigated the Dollar General burglary. On May 6, 2009, he found the Defendant installing an engine in a truck at the residence of Wesley Hatchel's grandparents. The Dresden Police Department took the Defendant into custody, and Agent Jackson's next interaction with the Defendant was at the Weakley County Jail approximately an hour and a half after finding him at Hatchel's grandparents' residence.

At the jail, the Defendant signed a written waiver and verbally waived his Miranda rights. In Agent Jackson's opinion, the Defendant did not appear to be under the influence of any alcohol or intoxicants at that time. After he Mirandized the Defendant, they began to discuss the events that transpired at the Dollar General Store. The Defendant asked Agent Jackson if he would be able to receive a plea bargain if he cooperated. Agent Jackson told the Defendant that he had no authority to make such deals. He read to the jury the Defendant's initialed statement, which provided:

> About 2:00 A.M. on 4/19/09, [Amy McElroy and I] pulled up to the Dollar General Store in Greenfield. I went to the side of the store. Amy parked down the street. I took some screws out of the metal and knocked a hole in the wall. I saw it was the bathroom, so I moved down the wall and did the same thing. I put my hands on the safe, tried to move it. I called Wes Hatchel looking for cutting torches. I couldn't get him to help, so we gave up since it was almost daylight. We left without taking anything.

At the conclusion of the State's proof, the Defendant moved for a judgment of acquittal, and the trial court denied the motion. The defense then proceeded with its case in chief.

Mylinda Pritchett testified that she became acquainted with the Defendant in January of 2009, when she needed someone to fix her brakes. In March, the Defendant performed the car work and also completed carpentry repairs on her house. In April, he painted a mural on Pritchett's daughter's wall. Pritchett stated that she became friends with the Defendant and that they talked about every other day. On the day that the Defendant was arrested, the Defendant came to Pritchett's door as she was preparing to leave for work. She allowed the Defendant to come inside her house, and he sat on the couch. She described him as "greasy and dirty," and he informed her that he had been working at Wesley Hatchel's grandfather's

house. The Defendant then walked into the kitchen "like an animal looking for food." He told Pritchett that he had not eaten or slept in several days. When Pritchett told the Defendant that one cannot go several days without eating or sleeping, he responded that when someone is on drugs that person will stay awake. The Defendant told Pritchett that he was taking methamphetamine. She gave him a bowl of cereal and began scolding him for his drug use, but once she turned back around to face him, he had left her house with the bowl of cereal. Pritchett testified that the next time she heard from the Defendant, he had been arrested. She bailed him out of jail and helped him secure legal counsel for his first trial.

Loretta Baker, the Defendant's mother, testified that before the Defendant's arrest he was living in the house next door to hers. The houses are connected by a doorway. She recalled that on the weekend of the break-in the Defendant spent the entire weekend with her. On the night of the break-in, she remembered that he returned home around 10:00 p.m. and remained at home the rest of the evening. She believed that she would have known had he left because she would have heard him through her intercom. On cross-examination, Baker acknowledged that, although she did not think that there was any way the Defendant was responsible for the burglary, she did not contact any authority to report this information until at least a year after the break-in.

At the close of proof, the jury deliberated and returned a verdict of guilty for burglary. The trial court sentenced the Defendant as a persistent offender to twelve years at forty-five percent. The Defendant filed a motion for new trial, which the trial court subsequently denied. He now appeals,[2] arguing that the trial court erred in denying the motion to suppress his confession and that the evidence is insufficient to support the jury's verdict.

## Analysis

### *Motion to Suppress*

The Defendant argues that the trial court erred in denying his motion to suppress his statement made to police officials. Specifically, the Defendant argues that, although the officers testified that they did not recall that the Defendant was intoxicated, Pritchett testified at trial regarding the Defendant's admission on the day of his arrest to his use of

_____

[2] At the time that the State filed its brief before this Court, the trial court had not yet denied the Defendant's motion for new trial by written order. Therefore, the State asserted that this Court lacked jurisdiction to consider the present appeal. However, the trial court denied the Defendant's motion on March 8, 2012. Although the Defendant filed his notice of appeal prematurely on June 30, 2011, we treat his notice of appeal as having been filed on March 8, 2012, pursuant to Rule 4(d) of the Tennessee Rules of Appellate Procedure.

methamphetamine. The State responds that because the Defendant failed to raise the issue of intoxication in his suppression motion he has waived appellate review of this issue.

Although the Defendant did not argue intoxication or narcotic use as a separate issue in his motion to suppress or at the suppression hearing, the Defendant's motion did state that he was "under the influence of an intoxicant." Additionally, both officers answered questions at the suppression hearing regarding the Defendant's demeanor at the time of his confession, and the trial court found that the Defendant was sober at the time he confessed. Thus, we conclude that the Defendant adequately raised this issue below, and we will address it on appeal.

In our review, we may consider the evidence adduced at the suppression hearing as well as evidence introduced at trial in determining whether the trial court properly denied the motion to suppress. State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998). Questions regarding the witnesses' credibility, "the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, we will uphold the trial court's factual findings unless the preponderance of the evidence is otherwise. Id. However, where the trial court has applied the law to the facts, we will conduct a *de novo* review. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Because the State is the prevailing party, it is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23.

The present issue involves the voluntariness of the Defendant's statements made to law enforcement officials, implicating the federal and state constitutional rights against forced self-incrimination. See Walton, 41 S.W.3d at 81. The Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, Malloy v. Hogan, 378 U.S. 1, 6 (1964), includes the following clause: "no person . . . shall be compelled in any criminal case to be a witness against himself." Similarly, article I, section nine of the Tennessee Constitution states that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself."

The United States Supreme Court held in Miranda v. Arizona, 384 U.S. 436, 444 (1966), that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Id. at 444. Such procedural safeguards include the requirement that law enforcement officials advise a defendant in a custodial interrogation:

that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Id. at 479; see also State v. Bush, 942 S.W.2d 489, 499 (Tenn. 1997). However, a defendant may waive these rights if such a waiver "is made voluntarily, knowingly, and intelligently." State v. Blackstock, 19 S.W.3d 200, 207 (Tenn. 2000) (quoting Miranda, 384 U.S. at 444). Courts must look at the totality of the circumstances of the custodial interrogation to determine whether the waiver is knowingly, intelligently, and voluntarily made. See Bush, 942 S.W.2d at 500.

Although the Tennessee Supreme Court has interpreted the state protection under article I, section nine to grant essentially the same protection as the Fifth Amendment, State v. Martin, 950 S.W.2d 20, 23 (Tenn. 1997), "the test of voluntariness for confessions under Article I, [section] 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." Walton, 41 S.W.3d at 82 (citation omitted). "[I]n order for a confession to be admissible, it must be 'free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence . . . .'" State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). Under Tennessee constitutional law, in order to consider the Defendant's relinquishment of his rights to be voluntary, "the defendant must have personal awareness of both the nature of the right and the consequences of abandoning his rights." State v. Thacker, 164 S.W.3d 208, 249 (Tenn. 2005) (citation omitted).

Our Supreme Court expressly has held that the mere consumption of alcohol prior to a defendant's confession does not render that confession involuntary. State v. Morris, 24 S.W.3d 788, 805-06 (Tenn. 2000). Rather, "[i]t is only when an accused's faculties are so impaired that the confession cannot be considered the product of a free mind and rational intellect that it should be suppressed." Id. at 805 (quoting State v. Robinson, 622 S.W.2d 62, 67 (Tenn. Crim. App. 1980)). In Morris, the Tennessee Supreme Court stated that the test to apply is "whether, at the time of the statement, the accused was capable of making a narrative of past events or of stating his own participation in the crime." Id. (citing State v. Beasley, No. 03C01-9509-CR-00268, 1996 WL 591203 (Tenn. Crim. App. Oct. 10, 1996)).

At the suppression hearing, Agent Jackson testified that he sat directly across the table from the Defendant and did not observe anything about the Defendant's demeanor to make him think that the Defendant was intoxicated. He testified to the same at trial. Officer Barber testified at the suppression hearing that he is quite familiar with the signs of

intoxication and effects of narcotics. While in the interview room, he observed that the Defendant seemed nervous but spoke coherently. Additionally, Officer Barber did not recall the Defendant's eyes appearing "extremely dilated" and stated that the Defendant seemed "just surprised."

At trial, Lieutenant Radford testified that when he took the Defendant into custody the Defendant appeared coherent, did not smell of alcohol, and had no alcohol near the vehicle where he was working. Lieutenant Radford also observed the Defendant receive and waive his Miranda rights. According to Lieutenant Radford, the Defendant appeared to understand the rights explained to him.

Pritchett testified at trial that at approximately 8:00 a.m. on the day the Defendant was taken into custody, the Defendant came to her house. She described him as "an animal looking for food." The Defendant told Pritchett that he had been taking methamphetamine, and, as a result, he had not eaten or slept in days.

Although the trial court did not have the opportunity to consider Pritchett's testimony at the suppression hearing, the evidence presented does not preponderate against the trial court's findings. Even assuming that the Defendant had used methamphetamine in the days and the morning leading up to his arrest, there is no evidence regarding his intoxication at the time of his arrest. According to Pritchett's testimony, the Defendant came over to her house at approximately 8:00 a.m. It was not until approximately 5:00 p.m. that the Defendant gave his statement to law enforcement officials. Every officer who testified stated that the Defendant appeared to understand his rights and comprehend the situation when he waived those rights. Additionally, the Defendant did not appear intoxicated to the officers. The Defendant has failed to demonstrate that he was under the influence of narcotics to the point that he lacked sufficient comprehension of the situation or of his rights. Accordingly, the evidence does not preponderate against the trial court's finding that the Defendant's waiver was voluntarily, knowingly, and intelligently made. Therefore, the Defendant is entitled to no relief on this issue.

*Sufficiency of the Evidence*

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). See also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant

has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Furthermore, it is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (citations omitted).

Pursuant to Tennessee Code Annotated section 39-14-402(a)(3) (2006), "[a] person commits burglary who, without the effective consent of the property owner: [e]nters a building and commits or attempts to commit a felony, theft or assault."

The Defendant contends that the evidence is not sufficient to support his burglary conviction. He alleges that "[t]he evidence presented by the State in its attempt to corroborate the Defendant's statement to law enforcement officers does not meet the 'minimal or slight evidence' needed to sustain [the Defendant's] conviction upon appeal." (citing State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984)). Furthermore, the Defendant contends that the only evidence presented by the State to corroborate the Defendant's statement was the testimony of Amy McElroy– testimony, according to the Defendant, that should not be considered credible. Finally, the Defendant argues that he presented a viable alibi defense through the testimony of his mother, Loretta Baker, and that the State did nothing to discredit the alibi.

The State contends that the issue of corroboration is waived because the Defendant did not raise it in his motion for new trial. Even so, the State avers that the damage to the

Dollar General's office as described by the State's witnesses corroborates the Defendant's statement. The State also asserts that it was the jury's prerogative both to find the State's proof credible and to discredit the Defendant's alibi.

In Tennessee, it is well-established that an accomplice's uncorroborated testimony cannot be the sole basis of a defendant's conviction. State v. Bough, 152 S.W.3d 453, 464 (Tenn. 2004). Specifically,

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged.

Id. (quoting State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001)).

The evidence established that around 2:00 a.m. on April 19, 2009, the Defendant, along with McElroy, broke into the Dollar General Store with the intent to steal the safe in the office. Officer Cooper testified at trial that upon his inspection of the break-in he noticed that screws had been removed from the outside metal panels. He surmised that someone had removed the screws and pried back the metal panels to gain entry into the building. Inside the office, Officer Cooper noticed smudges on the safe from the sheet rock that looked as though someone had tried to handle or grab the safe. Lieutenant Radford acknowledged that he observed two holes in the wall of the Dollar General Store – one leading to the bathroom and one leading to the office.

McElroy testified that she and the Defendant were "smoking dope" together on the night they broke into the Dollar General Store. According to McElroy, the Defendant pried the sheet metal off the side of the building and broke through the sheet rock. She stated that their intent in breaking in was to remove the store's safe but that they were unsuccessful in doing so.

In the Defendant's statement, he stated that he went with McElroy to the Dollar General Store around 2:00 a.m. on April 19, 2009. He went to the side of the building and removed the screws from the sheet metal. He knocked a hole in the wall, but he realized that the hole mistakenly accessed the bathroom rather than the office. He moved further down

the wall and repeated the process, this time gaining entry into the office. He unsuccessfully attempted to remove the safe, and then he left with McElroy.

When viewed in a light most favorable to the State, the evidence is sufficient to support the Defendant's burglary conviction. The jury was not restricted to relying solely on the Defendant's statement or his accomplice's testimony in determining the Defendant's guilt. Rather, the testimony of the officers and McElroy and the Defendant's statement are all consistent with each other. The officer's testimony regarding the damage to the store corroborates both McElroy's testimony as well as the Defendant's statement.

To the extent the Defendant asserts that the jury should have discredited McElroy's testimony and should have accepted the Defendant's alibi, we will not disturb the jury's implicit credibility findings. See Winters, 137 S.W.3d at 655. Thus, the evidence is sufficient for a jury to find the Defendant guilty of burglary.

## CONCLUSION

For the reasons articulated above, we affirm the Defendant's burglary conviction.

_____
JEFFREY S. BIVINS, JUDGE

-12-